658 A.2d 282

RESOLUTION TRUST CORPORATION, AS RECEIVER FOR CITY
SAVINGS, F.S.B., PLAINTIFF–APPELLANT, v. WILLIAM LAN-
ZARO, AS SHERIFF OF MONMOUTH COUNTY, DEFENDANT–
RESPONDENT.

Argued November 28, 1994—Decided May 15, 1995.

246

*Kevin M. Crotty,* a member of the New York bar, argued the cause for appellant (*Cassidy, Foss & San Filippo,* attorneys; *Mr. Crotty* and *Harold J. Cassidy,* on the briefs).

*Fredrick P. Niemann,* Assistant County Counsel, argued the cause for respondent (*Malcolm V. Carton,* Monmouth County Counsel, attorney; *Mr. Niemann* and *Daniel W. Roskken,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

The question presented is whether Resolution Trust Corporation (RTC), in its capacity as receiver for City Savings, F.S.B. (City Savings), must pay the Sheriff of Monmouth County (Sheriff), William Lanzaro, a "fee" in the amount of $275,075. The fee is authorized by *N.J.S.A.* 22A:4–8, for services rendered by the Sheriff at the execution sale of property secured by mortgages held by RTC and at which RTC was the successful bidder. The Chancery Division held that RTC's exemption from state, county, and local taxation under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 *U.S.C.A.* § 1441a(g), was inapplicable because the Sheriff's charge was a fee and not a tax. 271 *N.J.Super.* 425, 638 *A.*2d 931 (1992). The Appellate Division affirmed substantially for the reasons stated by the Chancery Division. 271 *N.J.Super.* 189, 638 *A.*2d 812 (1994). We granted certification, 137 *N.J.* 166, 644 *A.*2d 614 (1994), and now reverse.

I

The essential facts are undisputed. As receiver for City Savings, RTC held the first and third mortgages on Stony Hill Apartments, a 376–unit residential apartment complex located in Eatontown, securing the indebtedness of the mortgagor Stony Hill Associates. On default of the mortgagor, RTC filed a complaint for foreclosure in September 1990. In May 1991, the Superior Court entered final judgment of foreclosure in favor of RTC,

which provided for the sale of the property and directed that the following sums be paid from the sale proceeds in the order indicated:

First. Plaintiff (RTC): $13,446,065.52 together with interest, counsel fees and costs.

Second. Provident Associates [holder of the second mortgage]: $5,723,220.74 with interest.

Third. Plaintiff (RTC): $3,370,178.50 with interest.

[271 *N.J.Super.* at 426, 638 *A.*2d 931.]

A writ of execution was obtained and delivered to the Sheriff, who levied execution on the property, duly advertised the execution sale with notice of its conditions, and scheduled the sale for September 16, 1991. On the day of the sale, before undertaking the bidding, the Sheriff read the conditions of sale, which included the condition that the successful bidder would pay the Sheriff's fee computed in accordance with *N.J.S.A.* 22A:4–8. Competitive bidding ensued between RTC and the holder of the second mortgage, Provident Associates. Because RTC's bid of $11,000,000 was the highest bid received, the Sheriff declared RTC the successful bidder. RTC then signed the conditions of sale.

Pursuant to *N.J.S.A.* 22A:4–8, the Sheriff's fee was equal to four percent of the first $5,000 of RTC's successful bid, and two-and-one-half percent of the amount exceeding the first $5,000. The Sheriff informed counsel for RTC that he had prepared the deed and would deliver it to RTC on payment of $275,075, the Sheriff's fee for conducting the sale pursuant to *N.J.S.A.* 22A:4–8, in addition to $369.58 in Sheriff's costs. The Sheriff's office's activities in connection with the sale consisted of receiving and recording the writ of execution, levying on the property, preparing the publication of the notice of sale, presiding over the sale and the bidding, preparing necessary documentation, such as the deed and conditions of sale, and making return on the writ. The Sheriff and various employees of his office had devoted about ten hours to those tasks. RTC refused to pay the fee, claiming an exemption under FIRREA.

RTC instituted this action, alleging that the Sheriff was barred from assessing the fees authorized by *N.J.S.A.* 22A:4–8 against RTC in its capacity as receiver of a failed thrift because such fees constitute a tax from which RTC is exempt. RTC contended that the imposition of the fee in connection with the sale bore no relation to the value of the administrative services provided by the Sheriff and his staff. The parties agreed that the Sheriff will neither demand payment of the fee nor readvertise the property for sale pending resolution of this appeal.

The Chancery Division held that the Sheriff's commission for the execution sale was a fee and not a tax. 271 *N.J.Super.* at 429, 638 *A.*2d 931. The court noted that RTC had made the decision to institute the foreclosure action, and that the statutory fee was imposed not only on RTC but on all purchasers at foreclosure sales. *Ibid.* The court thus found that "[u]nder those circumstances the payment of the [S]heriff's fee [was] simply a cost in the furtherance of [RTC's] business, similar to the fees it pays its lawyers, appraisers, property managers and other like professionals." *Ibid.* In respect of RTC's argument that the Sheriff's services in connection with the execution sale bore no relation to the fee, the court deemed that argument to be "overly simplistic," *id.* at 430, 638 *A.*2d 931, stating that the fee-charging structure has "a most reasonable relationship to the cost of maintaining all of the functions of a [Sheriff's office]." *Id.* at 431, 638 *A.*2d 931. Moreover, the court asserted that because the Sheriff's office is required to remit all fees collected to the county treasurer and is dependent on the county freeholders to fund the Sheriff's office, the Sheriff's fee cannot be viewed as an "ill-disguised revenue raising" tax. *Id.* at 433, 638 *A.*2d 931. Therefore, the court dismissed RTC's complaint, holding that RTC was not exempt from paying the Sheriff's fee following its successful bid at the sale, and ordering it to pay the fee. *Ibid.*

The Appellate Division affirmed, substantially for the reasons stated in the Chancery Division's opinion. 271 *N.J.Super.* at 190–91, 638 *A.*2d 812. The Appellate Division emphasized "that the

reasonableness of the relationship is properly determined not by a single transaction but rather by the overall statutory scheme, which is designed to provide for the self-support of this function of the [S]heriff's office." *Id.* at 191, 638 *A.*2d 812. Furthermore, it added that "reasonableness may be evaluated in terms of the benefit conferred upon the person required to pay as well as in terms of the expense to the [S]heriff in providing the service." *Id.* at 191–92, 638 *A.*2d 812.

## II

RTC, a federal governmental instrumentality that acts as receiver or conservator of failed thrift institutions, was established by Congress in 1989. 12 *U.S.C.A.* § 1441a(b). It was created as part of a comprehensive effort to resolve the financial crisis that threatened the stability of the savings and loan industry and the Federal Savings and Loan Insurance Corporation. H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 308 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 104. RTC's essential function is "to manage and dispose of the assets acquired from failed thrifts." *Ibid.* Congress expressly required that RTC conduct its operations "in a manner which * * * maximizes the net present value return from the sale or other disposition" of thrift assets entrusted to it. 12 *U.S.C.A.* § 1441a(b)(3)(C)(i).

To enhance RTC's ability to achieve its statutory mission, Congress exempted RTC and "its capital, reserves, surpluses, or assets [and income]" from all "state, municipal, and local taxation except taxes on real estate held by the Corporation, according to its value as other similar property held by other persons is taxed." 12 *U.S.C.A.* § 1441a(g). Congress's purpose in exempting RTC from state and local taxation is analogous to its purpose for granting a similar exemption to the Federal Deposit Insurance Corporation, which the Court of Appeals for the Fifth Circuit described in *Irving Independent School District v. Packard Properties,* 970 *F.*2d 58, 62–63 (1992):

The FDIC enjoys sovereign immunity from state tax penalties to facilitate its reconsolidation of failed banks; in addition to the Constitutional requirements, an admirable goal underlies that immunity. Whenever the FDIC can reduce the charges connected to property it has acquired, it can increase the value of the property, decrease its own losses, expedite resale, and save the nation's taxpayers and insured depositors a great deal of money.

Implementing its statutory authority to "establish * * * policies * * * [and] issue such rules, regulations, * * * guidelines, and statements as the Corporation considers necessary or appropriate to carry out its duties," 12 *U.S.C.A.* § 1441a(b)(11)(A), RTC has adopted a policy concerning payment of state and local taxes that provides in part:

### Other Related Taxes

The Corporation is immune from taxes other than *ad valorem* real property taxes. Taxes on sales, transfers, or other dispositions of Corporation property are generally in the nature of excise taxes which are levied on the transaction and not on the property (although the calculation of the amount of tax may be based on the property's sale price); the Corporation is immune from such taxes.

[Statement of Policy Regarding the Payment of State and Local Property Taxes, 56 Fed.Reg. 23426, 23427 (1991).]

■ The character of the charge imposed on RTC by the Monmouth County Sheriff, although denominated a "fee" by the statute authorizing its collection, *N.J.S.A.* 22A:4–8, ultimately must be determined by standards established under federal law for distinguishing between fees and taxes. See *Resolution Trust Corp. v. Winslow,* 9 *Cal.App.*4th 1799, 12 *Cal.Rptr.*2d 510, 515 (1992) ("Congress has provided that all actions involving the RTC arise under federal law * * *. * * * While section 1441a, subdivision (1)(i) is a jurisdictional statute, it also implies that Congress intended federal law to govern actions involving the RTC."). In *Macallen Co. v. Massachusetts,* 279 *U.S.* 620, 49 *S.Ct.* 432, 73 *L.Ed.* 874 (1929), the Supreme Court addressed the constitutionality of a Massachusetts excise tax imposed on corporations and based in part on interest received from securities, including United States Liberty Bonds and Federal Farm Loan Bonds that under federal law were exempt from state taxation. The Supreme Judicial Court of Massachusetts had held that the state tax was not imposed on income from the federal bonds, but that such

income simply constituted one of the factors used to compute the amount of the tax. Reversing, the Court held that state law was relevant but not conclusive in determining whether the tax was an unconstitutional levy on exempt income:

> The words of the act and the opinion of the state court as to the nature of the tax are to be given consideration and weight; but they are not conclusive. As it many times has been decided, neither state courts nor legislatures, by giving the tax a particular name, or by using some form of words, can take away our duty to consider its nature and effect. And this court must determine for itself by independent inquiry whether the tax here is what, in form and by the decision of the state court, it is declared to be, namely, an excise tax on the privilege of doing business, or, under the guise of that designation, is in substance and reality a tax on the income derived from tax-exempt securities.
>
> [*Id.* at 625–26, 49 *S.Ct.* at 433–34, 73 *L.Ed.* at 879 (citations omitted).]

*See also California v. Buzard,* 382 *U.S.* 386, 393, 86 *S.Ct.* 478, 483, 15 *L.Ed.*2d 436, 442 (1966) ("Although the [California] Revenue and Taxation Code expressly denominates the tax 'a license fee,' there is no persuasive evidence Congress meant state labels to be conclusive; therefore, we must decide as a matter of federal law what 'licenses, fees, or excises' means in the [Soldiers' and Sailors' Civil Relief Act of 1940].") (citation omitted).

Although federal law ultimately will determine whether the Sheriff's charge is a permissible fee or a prohibited tax, our own precedents are instructive, specifically those dealing with municipal ordinances purporting to be regulatory but challenged on the ground that they were designed primarily to raise revenue and therefore were *ultra vires.* Thus, in *Daniels v. Borough of Point Pleasant,* 23 *N.J.* 357, 129 *A.*2d 265 (1957), a building contractor challenged the constitutionality of an amendment to the local building code increasing the fees for building permits. The contractor's fees under the ordinance prior to the amendment averaged about eighteen dollars per house, and the corresponding fee under the amended ordinance would be about $262 per house. The record indicated that the fees to be raised under the new ordinance would exceed by over 700% the municipality's cost for the services rendered by the building inspector. The amendment was challenged as an impermissible tax, unauthorized by the Legislature. The Borough contended that its authority to regu-

late and control building within its borders included the power to charge fees to defray the cost of regulation. Concluding that the ordinance had been designed primarily to raise revenue and therefore exceeded the authority delegated by the Legislature, this Court invalidated the ordinance:

> Inherent in the power to regulate and control is the power to charge license fees primarily designed to defray the costs of such control. They must not, of course, exceed the bounds of reason considered in connection with the service and the cost of the service granted * * *.
>
>      *        *        *        *        *        *        *        *
>
> What the Borough of Point Pleasant is attempting to do here is to defray the general cost of government under the guise of reimbursement for the special services required by the regulation and control of new buildings.
>
> Here, the difference between the cost to the borough of regulating and controlling new construction bears no reasonable relation to the amount of revenue raised by the new amendatory ordinance. The record indicates that approximately the same services will now be rendered as were rendered in the prior years by the building inspector, and that the fees raised by the new ordinance exceed by more than 700% the cost of inspecting the buildings and regulating the construction. Admittedly, the purpose of the ordinance was to raise revenue to defray the increased cost of school and other government services. The philosophy of this ordinance is that the tax rate of the borough should remain the same and the new people coming into the municipality should bear the burden of the increased costs of their presence. This is so totally contrary to tax philosophy as to require it to be stricken down * * *.
>
> [*Id.* at 361–62, 129 *A*.2d 265.]

*See also Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 582, 583 *A*.2d 277 (1990) ("If the primary purpose of the fee is to raise general revenue, it is a tax. If, however, the primary purpose is to reimburse the municipality for services reasonably related to development, it is a permissible regulatory exaction.") (citation omitted); *Moyant v. Borough of Paramus,* 30 *N.J.* 528, 546, 154 *A*.2d 9 (1959) ("The power to regulate includes the right to charge a fee designed to defray the costs thereof, but such must not 'exceed the bounds of reason considered in connection with the service and the cost of the service granted.'" (quoting *Daniels, supra,* 23 *N.J.* at 361, 129 *A*.2d 265)); *Salomon v. City of Jersey City,* 12 *N.J.* 379, 393–94, 97 *A*.2d 405 (1953) ("[T]he comprehensive municipal license tax imposed

without any accompanying regulation by Jersey City's ordinance on all businesses including retailers, wholesalers and manufacturers and measured by gross receipts, payroll and footage, has no precedent whatever in our annals and was beyond all legislative contemplation * * *."); *cf. Automatic Merchandising Council v. Township of Edison,* 102 *N.J.* 125, 128, 506 *A.*2d 352 (1986) (observing that subject to reasonable limits municipal fees can exceed regulation costs); *Public Serv. Elec. v. New Jersey Dep't of Envtl. Protection,* 101 *N.J.* 95, 110–11, 501 *A.*2d 125 (1985) (noting that fees graduated on basis of volume or quantity are not illegal *per se* ); *Gross v. Township of Ocean,* 92 *N.J.* 539, 457 *A.*2d 836 (1983), *rev'g on dissent* 184 *N.J.Super.* 144, 157 (App.Div.1982) (invalidating as prohibited tax township's bidding procedure auctioning right to tow abandoned cars and observing that "[r]egardless of whether the bidder's payment is characterized as a license fee, a tax, or a franchise fee, in every realistic sense its primary purpose is to nourish the municipal treasury"); *Bellington v. Township of East Windsor,* 17 *N.J.* 558, 565, 112 *A.*2d 268 (1955) (sustaining local ordinance imposing license fees and regulations on trailer camps and observing that "[w]here the primary object is police regulation, it does not necessarily matter that the incidental result is revenue above the actual cost of supervision and control of the business; * * * *e contra,* where revenue is the principal objective of the tax, it is not sustainable under the police power alone").

Federal case law reveals a similar focus on the reasonableness of regulatory fees in distinguishing valid fees from impermissible taxes. In *Federal Land Bank of New Orleans v. Crosland,* 261 *U.S.* 374, 43 *S.Ct.* 385, 67 *L.Ed.* 703 (1923), an Alabama statute that imposed a mortgage-recording fee based on the amount of indebtedness secured by the mortgage was challenged as unconstitutional by a Federal land bank, asserting that its mortgages and income derived therefrom had been exempted from state and local taxation by federal law. Although the Alabama Supreme Court acknowledged that the Alabama statute effectively imposed a tax on mortgages, it sustained the statute's application to the bank on

the basis that the payment was optional because the bank was not obligated to record its mortgages. Reversing, the Supreme Court observed that under Alabama law recording was essential to protect the bank's lien against purchasers without notice. *Id.* at 377–78, 43 *S.Ct.* at 386, 67 *L.Ed.* at 705. Although acknowledging that Alabama could charge a reasonable recording fee reflecting the cost of the service, Justice Holmes, writing for the Court, observed that a charge measured by the amount of indebtedness constituted an invalid tax as applied to the land bank:

> Of course, the state is not bound to furnish its registry for nothing. It may charge a reasonable fee to meet the expenses of the institution. But in this case the legislature has honestly distinguished between the fee and the additional requirement that it frankly recognizes as a tax. If it attempted to disguise the tax by confounding the two, the courts would be called upon to consider how far the charge exceeded the requirement of support, as when an excessive charge is made for inspecting articles in interstate commerce. But it has made no such attempt. It has levied a general tax on mortgages, using the condition attached to registration as a practical mode of collecting it. In doing so, by the construction given to the statute by the supreme court, it has included mortgages that it is not at liberty to reach.
>
> [*Id.* at 378, 43 *S.Ct.* at 386, 67 *L.Ed.* at 705 (citation omitted).]

In *Massachusetts v. United States*, 435 *U.S.* 444, 98 *S.Ct.* 1153, 55 *L.Ed.*2d 403 (1978), the issue was the validity of an aircraft-registration tax collected by the federal government in respect of a helicopter operated by Massachusetts for police purposes. The Supreme Court adhered to the principle that a valid fee could be distinguished from an invalid tax primarily on the basis of the reasonableness of the charge in relation to the cost of providing the service. Sustaining the imposition of the registration fee, the Court observed:

> Whatever the present scope of the principle of state tax immunity, a State can have no constitutional objection to a revenue measure that satisfies the three-prong test * * *. So long as the charges do not discriminate against state functions, are based on a fair approximation of use of the system, and are structured to produce revenues that will not exceed the total cost to the Federal Government of the benefits to be supplied, there can be no substantial basis for a claim that the National Government will be using its taxing powers to control, unduly interfere with, or destroy a State's ability to perform essential services. The requirement that total revenues not exceed expenditures places a natural ceiling on the total amount that such charges may generate and the further requirement that the

measure be reasonable and nondiscriminatory precludes the adoption of a charge that will unduly burden state activities.

[*Id.* at 466–67, 98 *S.Ct.* at 1167, 55 *L.Ed.*2d at 420.]

*Capital Cities Communications, Inc. v. Federal Communications Commission,* 554 *F.*2d 1135 (D.C.Cir.1976), involving a challenge by a broadcaster to fees charged by the Federal Communications Commission (FCC) on the transfer of control of broadcast licenses, reflects a similar approach. The fees were contested in part on the ground that the FCC's fee schedule took into account the consideration paid for the transfer (or the gross revenue of the station), which exceeded the Commission's statutory authority. Setting aside the FCC's fee schedule, the court of appeals noted that the appropriate standard was the value of the service rendered by the Commission, not the benefit received by the station.

Second, we find the Commission's use of the consideration for the transfer (or the gross revenues of the station) as a measure of the fee to be not in accord with our decision, expressed in a companion case, that the proper standard is not value *derived* by the recipient but rather value *conferred* on the recipient. In our view, this standard requires the fee assessed to bear a *reasonable* relationship to the cost of the services rendered to identifiable recipients. This standard is not met where the persons who receive essentially the same physical services from the agency are charged a grossly variable fee solely for the reason that some are larger or have more income than others. If the cost to the agency of the services rendered in approving the transfer of a station for a consideration of $1 million are approximately the *same* as the costs in approving the transfer of a station for $2 million, the fee charged for performing the service cannot be doubled in latter instance. The same rule would apply if the fee were based on average gross revenues. * * * Such a fee structure would not comply with section 483a because it would not take into consideration the cost to the Government and would on this record not appear to bear any reasonable relation to the cost of the value conferred by the agency.

[*Id.* at 1138 (footnote omitted).]

*See also National R.R. Passenger Corp. v. City of New York,* 695 *F.Supp.* 1570, 1575 (S.D.N.Y.1988) (holding that rents charged Amtrak by New York City did not violate Amtrak's immunity from state taxes, and noting that whereas "[a] tax need not have any relation to governmental costs[,] * * * [a] user fee, on the other hand, must be no greater than the government's costs"), *aff'd,* 882 *F.*2d 710 (2d Cir.1989).

## III

We find unpersuasive the Appellate Division's reliance on *Liqui-fin Aktiengesellschaft v. Brennan*, 446 *F.Supp.* 914 (S.D.N.Y. 1978). In response to a hostile tender offer by Liquifin, the Ronson Corporation obtained an order attaching $1,500,000 of Liquifin's funds deposited in support of the tender offer. Liquifin obtained an order discharging the attachment conditioned on its payment of the New York City Sheriff's statutory fees and expenses, which, calculated on the basis of the sum attached, amounted to $75,625. Liquifin challenged the fees as a depriva-tion of its property without due process, in violation of its constitu-tional rights. The district court determined that the Sheriff's charge was a fee and not a tax, but that even if denominated a tax it was constitutionally sustainable based on the benefit derived by Liquifin:

> Even assuming, however, that poundage is a tax, the Court finds that it withstands constitutional scrutiny because it bears a direct relationship to services utilized by Liquifin. As observed by the United States Supreme Court, "[t]he simple but controlling question is whether the state has given anything for which it can ask return."
>
> Liquifin, of course, contends that it received no benefit from the state and certainly no benefit sufficient to warrant the exaction of $75,625 in poundage fees.
> * * *
> The sum exacted from Liquifin, $75,625, was concededly quite large and would be considered unreasonably so were the Court comparing this sum to the actual work expended by the sheriff in effectuating the discharge order. Compared, instead, to the benefit that accrued to Liquifin by virtue of the discharge—the release of $1,500,000 frozen at the Franklin National Bank—and to the legitimate state interest of supporting the judiciary, the poundage paid by Liquifin was not an arbitrary deprivation of its property without due process of law.
>
> [*Id.* at 920 (citation omitted).]

Based on the *Liquifin* court's analysis, the Appellate Division observed that "reasonableness may be evaluated in terms of the benefit conferred upon the person required to pay as well as in terms of the expense to the [S]heriff in providing the service." 271 *N.J.Super.* at 191–92, 638 *A.2d* 812. The flaw in that conclu-sion is that the *Liquifin* court held only that reasonableness based on benefit can be sufficient to sustain a tax against a due process challenge, but its holding cannot be read to suggest that a

governmental charge, excessive if measured by the cost of the service, nevertheless can be classified as a fee and not a tax based on the benefit conferred. That reading of *Liquifin* is directly contradicted by the decision of the Court of Appeals for the District of Columbia in *Capital Cities Communications, supra,* 554 *F.*2d at 1138.

In its decision sustaining the Sheriff's fee, the Chancery Division observed that

[t]he RTC decided to be the highest bidder to take title (rather than money) and thereby control the timing of a later resale at a better price. * * * [T]he RTC's decision does not cause the [S]heriff's fee to become a "tax." * * * Under those circumstances the payment of the [S]heriff's fee is simply a cost in the furtherance of [RTC's] business * * *.

[271 *N.J.Super.* at 429, 638 *A.*2d 931.]

That RTC elected to outbid others at the foreclosure sale obviously is not dispositive of the issue whether the Sheriff's charge is a prohibited tax. Irrespective of its statutory designation as a fee, both our own cases and the federal precedents view as controlling the relationship between the amount of the charge and the cost of the service rendered. This record reveals an enormous disparity: the services rendered by the Sheriff and employees of his office required approximately ten hours of work; the fee imposed, determined solely on the basis of the amount of the successful bid for the property, was $275,000. Where the disproportion between the charge and the cost of the service is excessive, as it is here, the conclusion is inescapable that the charge imposed is intended primarily to raise revenue and not to compensate the governmental entity for the cost of providing its service. *Daniels, supra,* 23 *N.J.* at 362, 129 *A.*2d 265.

Nor is the revenue-raising characteristic of the Sheriff's fee diminished by the statistics, emphasized by the lower courts, demonstrating that the annual amount of the fees collected by the Sheriff and remitted to the County defray a substantial portion of the cost of operating the Sheriff's office. That the Sheriff's fees are substantial enough to offset approximately one-third of the budgeted costs of operating his office may well substantiate the

soundness of the fee schedule as a matter of legislative policy. But the success of the fee schedule as a revenue source cannot justify imposition of the fee on an entity that Congress has declared to be totally exempt from such exactions.

■ Moreover, we note that Congress specifically exempted RTC from state and local taxation in respect of its acquisition of assets from failed thrift institutions. Pursuant to FIRREA, 12 *U.S.C.A.* § 1441a(b)(4), RTC is authorized to exercise all of the powers conferred on the Federal Deposit Insurance Corporation (FDIC) by sections 11, 12, and 13 of the Federal Deposit Insurance Act, 12 *U.S.C.A.* §§ 1821, 1822, and 1823. In accordance with § 13 of that Act, FDIC, and hence RTC, can acquire from itself as receiver assets previously owned by failed thrift institutions, 12 *U.S.C.A.* § 1823(d), and in such event FDIC, and RTC, shall be exempt from state and local taxation to the same extent as FDIC, in its capacity as receiver, is exempt from such taxation pursuant to 12 *U.S.C.A.* § 1825(b). That statutory exemption from state and local taxation, afforded to RTC when it acquires assets sold by itself or another acting as receiver, forecloses any argument that RTC's general exemption from state and local taxation did not apply when it acquired title to the Stony Hill Apartments at the foreclosure sale.

■ We are fully satisfied that for purposes of FIRREA, and its statutory exemption of RTC from state and local taxation, the charge sought to be imposed by the Sheriff of Monmouth County is essentially equivalent to a tax measured by the sale price of the foreclosed property. As such, it cannot lawfully be imposed on RTC.

IV

We reverse the judgment of the Appellate Division and remand the matter to the Chancery Division for further proceedings consistent with this opinion.

Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, and GARIBALDI join in this opinion. Justice COLEMAN did not participate.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—None.