973 P.2d 736

STATE of Hawai'i, Plaintiff,

v.

Charles C. MEDEIROS, Defendant

Charles C. Medeiros, Petitioner–Appellee,

v.

Roy Amemiya, Jr., in his capacity as Director of Finance for the City and County of Honolulu, and Peter B. Carlisle, in his capacity as Prosecuting Attorney, Respondents–Appellants

No. 20778

Supreme Court of Hawai'i.

Jan. 11, 1999.

Deborah L. Kim, Deputy Public Defender, on brief, for petitioner-appellee Charles C. Medeiros.

Chris A. Diebling, Deputy Corporation Counsel, on brief, for respondents-appellants Roy Amemiya, Jr., and Peter B. Carlisle.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The respondents-appellants Roy Amemiya, Jr., in his capacity as Director of Finance for the City and County of Honolulu, and Peter B. Carlisle, in his capacity as Prosecuting Attorney, (hereinafter collectively referred to as "the city") appeal from the order of the first circuit court enjoining the city from implementing or enforcing the provisions of chapter 6, article 52 of the Revised Ordinances of the City and County of Honolulu (ROCCH) (Supp.1998) (hereinafter, the ordi-

nance).[1] The city argues that the circuit court erred because (1) the city is empowered to enact such an ordinance pursuant to Hawai'i Revised Statutes (HRS) § 46–1.5(8) (1993),[2] and (2) the ordinance has not been preempted by the Hawai'i Penal Code. Inasmuch as the city's first argument is without merit, this court need not address the second. Accordingly, we affirm the order of the first circuit court.

## I. BACKGROUND

On December 4, 1996, the petitioner-appellee Charles C. Medeiros was charged by way of complaint with one count of unauthorized entry into motor vehicle, in violation of 1996 Haw. Sess. L. Act 87, § 2, now codified as

1. ROCCH 6–52, entitled "Fee for Convicted Persons," provides in relevant part:

 **Sec. 6–52.1 Application.**
 A person convicted of any misdemeanor or any felony offense or of any violation of HRS Section 291–4, in any state court of the first circuit, State of Hawaii, shall pay a fee as provided in Section 6–52.2. In cases where a person is convicted of multiple offenses arising out of the same incident or transaction, only one fee shall be imposed.

 **Sec. 6–52.2 Fee.**
 Any convicted person who is required to pay a fee pursuant to Section 6–52.1 shall pay, in addition to any fines or charges which may be imposed by the court pursuant to its authority under Part III of HRS Chapter 706, a service fee of $250.00 for services performed by the city in connection with the arrest, processing, investigation, and prosecution of the convicted person.

 **Sec. 6–52.3 Enforcement.**
 (a) The prosecuting attorney shall provide the director of finance with the name and address of any person convicted of one or more of the offenses enumerated in Section 6–52.1 in a court of the first circuit, State of Hawaii, together with a statement of the statutory provision(s) violated and/or a description of the offense(s) for which the person has been convicted, the court in which the conviction occurred and the date of conviction.
 (b) The director of finance shall cause a notice of assessment to be issued to the convicted person described in subsection (a). The notice shall state the offense or offenses for which the fee is assessed, the amount of the fee assessed, and a statement that the fee shall become due 30 days from the date of the notice. The director of finance shall have the discretion to determine the appropriate manner of payment.

 **Sec. 6–52.4 Civil Fines.**

 Any convicted person who receives a notice pursuant to Section 6–52.3(b) and who fails to pay the fee required under Section 6–52.2 within the time provided for payment shall be subject to a civil fine in an amount not to exceed twice the amount of the fee.

 . . . .

 **Sec. 6–52.6 Expenditure of fee.**
 The service fees and civil fines collected by the director pursuant to this article shall first be used to pay all of the administrative costs of the city in collecting the fee. After such costs are paid, the city may use the remaining revenues from the fee and fines for law enforcement purposes, including expenses of the police department and department of the prosecuting attorney; provided that any expenditure of the fees and fines collected by the director shall be in accordance with an appropriation or appropriations in the annual operating budget ordinance or any amendments thereto.

 As an "Editor's Note" in the ROCCH indicates, the ordinance contained a "sunset" provision that established an expiration date, namely, two years after its effective date, which was June 14, 1996. *See* City and County of Honolulu Ordinance No. 96–40 § 3, slip ordinance at 4 (June 14, 1996). The ordinance does not appear to have been revived. Accordingly, it is no longer in effect. Inasmuch as it *was* in effect at the time of Medeiros's conviction, however, this appeal does not appear to be moot because Medeiros remains subject to its terms.

2. HRS § 46–1.5 provides in relevant part that, "[s]ubject to general law, each county shall have the following powers and shall be subject to the following liabilities and limitations: . . . . (8) Each county shall have the power to fix the fees and charges for all official services not otherwise provided for."

HRS § 708–836.5 (Supp.1997).[3] On March 5, 1997, Medeiros pled guilty, pursuant to a plea agreement with the prosecution. On May 6, 1997, prior to his sentencing hearing, Medeiros filed a "Motion To Enjoin The Enforcement Of Section 6–52 Of The Revised Ordinances Of Honolulu." The motion listed Amemiya and Carlisle as "respondents" in their official capacities, and the certificate of service indicated that Corporation Counsel and Carlisle had been served. The city filed a memorandum in opposition to the motion on May 12, 1997.

Immediately following Medeiros's sentencing hearing on May 16, 1997, the circuit court heard arguments on his motion with respect to the ordinance. The circuit court then orally granted the motion. The circuit court's written findings of fact (FOFs), conclusions of law (COLs), and order granting Medeiros's motion for an injunction were filed on May 28, 1997. The circuit court's FOFs and COLs included the following:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

. . . .

9. In enacting the Ordinance, the Honolulu City Council (council) stated the following as its "Finding and Purpose":

The council finds that each year the Honolulu police department conducts thousands of investigations of criminal activities and spends many hours testifying at the criminal trials of individuals arrested for crimes. Although the outcome of these trials may result in convictions of individuals charged with the offenses, and the consequences of such convictions result in the court imposing fines, and/or terms of imprisonment, the city receives none of the funds collected through the judicial process. Yet, it is the city's police force and, in most instances, the city's prosecuting attorney's office, which provide the services needed to arrive at such convictions.

The council further finds that the burden of defraying some of the costs for these criminal investigative services provided by the city should rest on persons convicted of crimes in this state. Therefore, it is the purpose of this ordinance to impose a service fee on persons convicted of certain crimes. . . .

. . . .

12. The City and County of Honolulu (City) generates its revenue primarily from real property taxes, which, among other things, support the police and prosecutorial functions.

. . . .

14. To qualify as a "service" under HRS § 46–1.5(8), the governmental activity must confer some benefit, direct or indirect, to the beneficiary which is separate and apart from any benefit conferred to the public at large.

15. Taken as a whole, the Ordinance is a revenue generating measure that is a tax or a levy of costs based on a conviction. In reaching this conclusion, the Court notes that the Council found that the burden of defraying some of the costs for criminal investigative services provided by the City should rest on persons convicted of certain crimes in this State. To the extent that those costs are also shared by the public at large through real property tax revenues, the assessment under the Ordinance is a tax.

16. The Council has tied the imposition of the assessment to a conviction of a state statute and has also correlated the assessment to fines or charges imposed by the courts. To that extent, the assessment is a cost and not a service fee.

17. Pursuant to the Hawaii Penal Code and HRS Chapter 706, the State of Hawaii has preempted the counties in matters re-

---

3. HRS § 708–836.5 provides:
 **Unauthorized entry into motor vehicle.** (1) A person commits the offense of unauthorized entry into motor vehicle if the person intentionally or knowingly enters or remains unlaw-
fully in a motor vehicle with the intent to commit a crime against a person or against property rights.
 (2) Unauthorized entry into motor vehicle is a class C felony.

lating to charges imposed as a result of a state conviction.

18. The City may not enact any such assessment without the express permission of the state legislature and the executive.

19. The Ordinance conflicts with Article 8, section 3 of the Hawaii Constitution, HRS Title 37, *Hawaii Penal Code,* and HRS § 801–4.

20. Although not necessary to the court's ruling, the court further concludes that a state court may, as a part of sentencing, assess costs against an individual defendant for investigative and prosecutorial services, as long as the amounts do not exceed the authorized statutory fine. The courts have the power to direct that such costs be paid to the City.

The city filed a timely notice of appeal on June 18, 1997.

## II. *STANDARDS OF REVIEW*

### A. *Conclusions Of Law*

We review the trial court's [COLs] *de novo* under the right/wrong standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [COL] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*State v. Kane,* 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998) (quoting *Aickin v. Ocean View Inv. Co.,* 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997)).

### B. *Interpretation Of A Statute Or Ordinance*

"[T]he interpretation of a statute [or ordinance] ... is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1983) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari

materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

Ho v. Leftwich, 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting Korean Buddhist Dae Won Sa Temple v. Sullivan, 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)).

### III. DISCUSSION [4]

 "Municipal corporations are solely the creation of the State. As such[,] they may exercise only those powers which have been delegated to them by the State legislature." In Re Application of Anamizu, 52 Haw. 550, 553, 481 P.2d 116, 118 (1971) (citations omitted). See also Haw. Const. art. VIII, § 1 (1978) ("Each political subdivision shall have and exercise such powers as shall be conferred under general laws."). Accordingly, if no provision of the Hawai'i Constitution or the HRS empowers the city to enact and enforce the ordinance, the ordinance is invalid.

Article VIII, section 3 of the Hawai'i Constitution (1978) provides in relevant part that "[t]he taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively

---

4. Neither party raises the unusual procedural fashion in which the injunction issue was broached in the circuit court. Rather than filing an independent civil lawsuit for an injunction, Medeiros simply filed a motion as part of the proceedings of his own criminal case. Amemiya and Carlisle were listed as "parties" on the motion, and the certificate of service recites that both Carlisle and Corporation Counsel (presumably, on behalf of Amemiya) were served with copies. Deputy Corporation Counsel Donna Woo filed a memorandum in opposition to the motion on behalf of both Amemiya and Carlisle, and fully participated in the hearing held on the issue. She never objected to the procedural stance of the motion. The circuit court then issued an order enjoining the city from enforcing the ordinance in any case.

In its order granting Medeiros's motion, the circuit court ruled that it "had jurisdiction over the matter pursuant to HRS § [§ ] 603–21.9(1) and (6), 603–21.5(3) and 603–21.7(b)." HRS § 603–21.9 (1993) provides in relevant part that [t]he several circuit courts shall have power:

(1) To make and issue all orders and writs necessary or appropriate in aid of their original or appellate jurisdiction;
...
(6) To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

(Emphases added.) HRS § 603–21.5 provides in relevant part that "[t]he several circuit courts shall have jurisdiction, except as otherwise expressly provided by statute, of: ... (3) Civil actions and proceedings [.]" (Emphases added.) Finally, HRS § 603–21.7 (1993) provides in relevant part that

[t]he several circuit courts shall have jurisdiction, without the intervention of a jury, except as provided by statute, as follows:
...
(b) Of actions or proceedings in or in the nature of habeas corpus, prohibition, mandamus, quo warranto, and all other proceedings in or in the nature of applications for writs directed to courts of inferior jurisdiction, to corporations and individuals, as may be necessary to the furtherance of justice and the regular execution of law.

(Emphases added.) In addition, this court has held that
the circuit courts in this state are courts of general jurisdiction. State v. Villados, 55 Haw. 394, 520 P.2d 427 (1974). As such, "jurisdiction extends to all matters properly brought before them, unless precluded by constitution or statute." In re Chow, 3 Haw.App. 577, 656 P.2d 105, 109 (1982) (citing In re Keamo, 3 Haw.App. 360, 650 P.2d 1365 (1982)).
State v. Dwyer, 78 Hawai'i 367, 370, 893 P.2d 795, 798 (1995).
In short, it appears that the legislature has accorded the circuit courts the power to issue whatever orders are "necessary" to "carry into full effect the[ir] powers" and for the "promotion" or "furtherance" of justice, unless specifically prohibited by statute. There does not appear to be any specific statute forbidding the circuit courts from issuing "civil" orders—such as the injunction in the instant case—during a criminal proceeding. Moreover, inasmuch as Medeiros was automatically subject to the city's "fee" as a direct result of his conviction in the instant case, the circuit court's implied finding that addressing the issue of the validity of the fee ordinance was "necessary" for the "promotion of justice" in Medeiros's case was justified. Accordingly, despite the fact that Medeiros's motion was brought incident to his criminal conviction, the circuit court had subject matter jurisdiction over his motion for an injunction.

by the counties." The city does not argue that the legislature has accorded it the power to tax persons convicted of crimes in order to fund its police and prosecution functions. Rather, the city argues that the ordinance establishes a service fee as authorized by HRS § 46–1.5(8), *see supra* note 2. The question of what constitutes a "fee" or "charge" for "official services" pursuant to that section is one of first impression in Hawai'i.

ROCCH § 6–52.2 self-characterizes its charge against convicted persons as a "fee." However, "[t]he nature of the tax [or "charge"] that a law imposes is not determined by the label given to it but by its operating incidence." *Stewarts' Pharmacies v. Fase,* 43 Haw. 131, 144, *reh'g denied,* 43 Haw. 166 (1959) (citation omitted). *See also City of Huntington v. Bacon,* 196 W.Va. 457, 473 S.E.2d 743, 752 (1996) ("It is [a] well-nigh universal principle that courts will determine and classify taxation on the basis of realities, rather than what the tax is called in the taxing statute or ordinance." (Internal quotation marks and citation omitted.)). *Cf. Emerson College v. City of Boston,* 391 Mass. 415, 462 N.E.2d 1098, 1105 (1984) (holding that while "the intention of the Legislature, as it may be expressed in part through its characterization [of the charge] ... deserves judicial respect, ... the nature of a monetary exaction must [ultimately] be determined by its operation rather than its specially descriptive phrase" (some brackets added and some in original) (internal quotation marks and citations omitted)). To distinguish between a "fee" and a "tax" under similar circumstances, a number of jurisdictions have adopted the following formulation articulated by the *Emerson College* court:

> Fees imposed by a governmental entity tend to fall into one of two principal categories: user fees, based on the rights of the entity as a proprietor of the instrumentalities used, or regulatory fees (including licensing and inspection fees), founded on the police power to regulate particular businesses or activities. Such fees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner "not shared by other members of a soci-

ety," *National Cable Television Ass'n v. United States,* 415 U.S. 336, 341, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974); they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge, *Vanceburg v. Federal Energy Regulatory Comm'n,* 571 F.2d 630, 644 n. 48 (D.C.Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978), and the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses.

462 N.E.2d at 1105 (some citations and footnote omitted). *See also In re Menier,* 59 B.R. 588, 593 (Bankr.N.D.Ohio 1986); *State v. City of Port Orange,* 650 So.2d 1, 3 (Fla. 1994); *Executive Aircraft Consulting, Inc. v. City of Newton,* 252 Kan. 421, 845 P.2d 57, 62 (1993) (collecting cases); *Butler v. Supreme Judicial Court,* 611 A.2d 987, 990 (Me.1992). Moreover, "[i]f the 'fee' unreasonably exceeds the value of the specific services for which it is charged[,] it will be held invalid." *Executive Aircraft Consulting, Inc.,* 845 P.2d at 62 (quoting *National Cable Television Ass'n Inc. v. F.C.C.,* 554 F.2d 1094, 1106 (D.C.Cir.1976)) (internal quotation marks omitted).

Subsequent to its opinion in *Emerson College,* the Massachusetts Supreme Judicial Court has weakened its adherence to the second identifying factor described in *Emerson College*—voluntary receipt of the "service"—holding that "the element of choice is not a compelling consideration which can be used to invalidate an otherwise legitimate charge." *See Nuclear Metals, Inc. v. Radioactive Waste Management Bd.,* 421 Mass. 196, 656 N.E.2d 563, 570 (1995) (holding an assessment against a producer of low-level radioactive waste to be a valid fee, despite the fact that the producer could not decline to pay the fee and remain in business). Several other jurisdictions have also either expressly or impliedly declined to place great reliance on the voluntariness of a service in assessing whether a charge is a fee or a tax. *See, e.g., Bloom v. City of Fort Collins,* 784 P.2d 304, 310–11 & n. 8 (Colo.1989) ("[W]e decline to engraft a "voluntariness" factor

onto the tax-fee distinction in resolving this case."); *Resolution Trust Corp. v. Lanzaro*, 140 N.J. 244, 658 A.2d 282, 288 (1995) ("[A] valid fee c[an] be distinguished from an invalid tax primarily on the basis of the reasonableness of the charge in relation to the cost of providing the service." (Citation omitted.)); *Rizzo v. City of Philadelphia*, 668 A.2d 236, 238 (Pa.Commw.Ct.1995) ("[T]he crucial factor in determining whether a municipal charge for services constitutes a valid regulatory fee is whether the charge is intended to cover the cost of administering a regulatory scheme or providing a service.").

The *Nuclear Metals* approach—*i.e.*, that a person or entity may benefit from a government service even though he or she has not voluntarily requested it—seems sensible to us. The facts of *Rizzo* provide an apt illustration. In that case, the plaintiffs challenged a Philadelphia ordinance imposing a service fee on the use of city emergency medical services. *See Rizzo*, 668 A.2d at 236–37. For obvious reasons, many of those needing the services were incapable at the time of choosing whether or not to receive them. Nevertheless, because the city was providing a direct, personalized benefit to such persons, it was deemed reasonable for the city to assess a "fee" related to the cost to it of providing that benefit. Similarly, a city may require the owner of a residential property to maintain connections to the municipal sewer system and then legitimately assess a charge based on the owner's use of the system. *See Ripperger v. Grand Rapids*, 338 Mich. 682, 62 N.W.2d 585 (1954) (upholding a "fee" for sewage disposal services). Certainly, such "fees" do not appear to be any more intrinsically "tax-like" than fees for services requiring advance approval from the recipient. Thus, the "voluntariness" of the service charge or fee would seem to be essentially beside the point.

■ Accordingly, we hereby adopt a modified *Emerson College* test for determining whether a charge is a fee or a tax, in which we analyze whether the charge (1) applies to the direct beneficiary of a particular service, (2) is allocated directly to defraying the costs of providing the service, and (3) is reasonably proportionate to the benefit received.

■ The parties do not address whether the second or third prongs of the modified *Emerson College* test have been met in the instant case. With regard to the third prong, although there was no evidence adduced on the issue in the circuit court, it seems intuitively obvious that the $250.00 charge authorized by ROCCH § 6–52.2, *see supra* note 1, is quite modest in comparison to the costs regularly incurred by the prosecuting attorney and the Honolulu Police Department in investigating and prosecuting a criminal case.

With regard to the second prong, however, we note that ROCCH § 6–52.6, *see supra* note 1, provides, *inter alia*, that, after the city's administrative costs in gathering the fees have been covered, the city "*may*" use the remaining funds for law enforcement purposes, "*including* expenses of the police department and department of the prosecuting attorney," so long as the funds are allocated "in accordance with ... the annual operating budget ordinance or any amendments thereto." (Emphases added.) The use of the terms "may" and "including," as highlighted above, and the caveat regarding the supremacy of the city's budget ordinance clearly indicate that the ordinance does not *require* that the funds generated by the "convicted persons" charge be used to defray the city's investigative and prosecutorial costs associated with the individual payor's case, leaving open the possibility that the charge could be used for general revenue raising purposes, the classic realm of taxation. On this basis alone, the ordinance must be considered a tax and, therefore, invalid.[5]

---

5. We have held in the past that, "in determining whether a statute is mandatory or directory, we may determine the intention of the legislature from a 'consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other.'" *State v. Samonte*, 83 Hawai'i 507, 518, 928 P.2d 1, 12 (1996) (quoting *Jack Endo Elec., Inc. v. Lear*

*Siegler, Inc.*, 59 Haw. 612, 617, 585 P.2d 1265, 1269 (1978) (citation and quotation marks omitted)). The consequence of reading the phrase, "the city may use the remaining revenues from the fee and fines for law enforcement purposes, including expenses of the police department and department of the prosecuting attorney," as directory rather than mandatory is to render the

Moreover, with regard to the first *Emerson College* prong, the "service" of being investigated and prosecuted clearly does not "benefit" the payors of the charge, *i.e.*, the persons convicted as a result of the work of the police and the prosecutors; rather, it benefits society at large. In its somewhat breathtaking argument to the contrary, the city urges that a convicted person receives a direct, "unique" benefit,

> the same as the entrance into the City's zoo is unique to those who actually enter and pay its fee. The zoo exists for all of the public and there is an indirect benefit to those members of the public [who] don't enter the zoo much the same way there is an indirect benefit to the public in having law violators apprehended and prosecuted; but the direct beneficiary is the zoo goer in one case and the law violator in the other.

The city describes the nature of the "service" delivered to convicted persons as follows:

> This is a service in that it assists persons in preventing further harm to themselves, especially in the case of a drunk driver[6]

who[,] if not apprehended[,] could kill himself or others, and it prevents them from harming others. Hopefully, this service also helps to convince the offender to cease his unlawful activities and become a law[-]abiding and productive member of society....

> ... This specifically benefits them by keeping them safe ... from possible future civil suits from victims of their law violations.

The city's zoo analogy would be more apt if the city charged the animals caged there a fee rather than the visitors. In such a case, the city might argue that caging the animals saves them from the rigors of foraging or hunting, the stress of possible predation, and the heartbreak of shrinking habitats, and provides them instead with a clean and comfortable living environment in desirable Waikīkī. We are only too aware of the damage that a rampaging elephant, loosed from a cage, can do to humans and property, and what unhappy fate awaits such an imprudent

---

ordinance unconstitutional. Thus, pursuant to *Samonte*, we would be inclined to presume that the city intended its use of the term "may" in that phrase as mandatory rather than directory. *Cf. Kane*, 87 Hawai'i at 74, 951 P.2d at 937 ("[W]here possible, we will read a penal statute in such a way as to preserve its constitutionality."); *State v. Bates*, 84 Hawai'i 211, 220, 933 P.2d 48, 57 (1997) (same); *State v. Kaakimaka*, 84 Hawai'i 280, 290, 933 P.2d 617, 627 (same), *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997); *State v. Gaylord*, 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (same).

However, we note that the city repeatedly employed the term "shall" in the other subsections of the same ordinance. *See, e.g.*, ROCCH § 6–52.2 ("Any convicted person ... *shall* pay ... a service fee of $250.00[.]"); ROCCH § 6–52.3(a) ("The prosecuting attorney *shall* provide the director of finance with the name and address of any person convicted of one or more offenses[.]"); ROCCH § 6–52.4 ("Any convicted person who receives a notice ... and who fails to pay the fee ... *shall* be subject to a fine[.]"). (Emphases added.) More importantly, the city employed the word "shall" twice in ROCCH § 6–52.6 itself. The first sentence of that subsection provides that "[t]he service fees and civil fines collected by the director pursuant to this article *shall* first be used to pay all of the administrative costs of the city in collecting the fee." (Emphasis added.) In addition, the city employs the term "shall" in the *same sentence* as the phrase at issue, providing that "any expenditure of the

fees and fines collected by the director *shall* be in accordance with an appropriation or appropriations in the annual operating budget ordinance[.]" (Emphasis added.)

In the past, this court has subscribed to the proposition that, "[w]here [the] verbs ['shall' and 'may'] are used in the same statute, especially where [they] are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings." *In re Tax Appeal of Fasi*, 63 Haw. 624, 626–27, 634 P.2d 98, 101 (1981) (citations omitted). Not surprisingly, we have therefore construed the "close proximity of the contrasting verbs 'may' and 'shall' [to] require[] a *mandatory* effect for the term 'shall.'" *Id.* at 627, 634 P.2d at 101 (emphasis added). Thus applied to [ROCCH § 6–52.6], the converse would seem to follow, namely that the close proximity of the contrasting verbs "may" and "shall" requires a *non-mandatory, i.e.*, a discretionary, construction of the term "may."

*Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) (emphases in original). Accordingly, although it renders the ordinance unconstitutional, we are constrained to construe the term "may" in its ordinary, discretionary sense.

6. We note that there was no allegation that Medeiros had been intoxicated while committing the "auto burglary" charged in this case.

animal.[7] Why shouldn't Dumbo help to pull his own weight in connection with the city's costs in protecting him so graciously against his own unwise impulses?

■ Apparently anticipating some skepticism with regard to its position, the city further argues that

[t]o say that arrest and prosecution is of no benefit to a law violator is tantamount to saying that the penal system is totally devoid of any ability to rehabilitate. One of the foundations of our penal system is rehabilitation, and before an offender can be rehabilitated, he or she must be apprehended and prosecuted. Without providing those services specifically to an individual law violator, that person may never see the error of his or her ways[8] and may eventually end up causing serious injury to themselves or others.

*Id.* at 12. Certainly, as the city appears to observe, one of the state's purposes in the disposition of convicted persons is rehabilitation. *See* HRS § 706–606(2)(d) (1993) (listing, as one of the factors to be considered in sentencing, "the need ... [t]o provide the defendant needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"). However, at least since 1986, rehabilitation has hardly been a "foundation" of the penal system. As this court noted in *State v. Gaylord,* 78 Hawai'i 127, 149–50, 890 P.2d 1167, 1189–90 (1995), in 1986 amendments to the penal code, the legislature decided to "shift from the present approach of sentencing which emphasizes rehabilitation toward achieving the goal of just punishment" and satisfying "the need to afford deterrence[.]" (Quoting Sen. Conf. Comm. Rep. No. 51–86, in 1986 Senate Journal, at 748) (emphasis deleted). Accordingly, while rehabilitation remains a goal of the system, the principal goals are deterrence and punishment, both of which are calculated to benefit society at large, as opposed to the individual convicted person.

In any case, it is not at all clear that the primary goal of rehabilitation is to benefit the convicted person, as this court observed in *Gaylord:*

Rehabilitation ... consists ... of changing an offender's personality, outlook, habits, or opportunities so as to make him or her less inclined to commit crimes. *Often rehabilitation is said to involve "helping" the offender, but a benefit to the offender is not necessarily presupposed: those who benefit are other persons, ourselves, who become less likely to be victimized by the offender.*

*Id.* at 148 n. 36, 890 P.2d at 1188 n. 36 (quoting A. von Hirsch and A. Ashworth, *Principled Sentencing* 1 (1992) (footnote omitted)) (emphasis added). That the *social* benefit of rehabilitation is of primary importance is evidenced in the city's own argument that a miscreant who is deprived of the state's rehabilitative "services" "may eventually end up causing serious injury to ... others."

7. *See* Dan Nakaso, *Elephant Rampage: 1 killed; 13 injured; panic at Blaisdell*, Honolulu Advertiser, Aug. 20, 1994, at A1 col. 4 (describing the tragedy that occurred when "Tyk," an African elephant owned by a visiting circus, killed one of its handlers and rampaged through the streets of Honolulu until it was finally shot to death by the police).

8. 'Do you know where you are Winston?' he said. (2) Unauthorized entry into motor vehicle is a class C felony. 'I don't know. I can guess. In the Ministry of Love.' 'Do you know how long you have been here?' 'I don't know. Days, weeks, months—I think it is months.' 'And why do you imagine that we bring people to this place?'

'To make them confess.' 'No, that is not the reason. Try again.' 'To punish them.' 'No!' exclaimed O'Brien. His voice had changed extraordinarily, and his face had suddenly become both stern and animated. 'No! Not merely to extract your confession, nor to punish you. Shall I tell you why we have brought you here? To cure you! To make you sane! Will you understand, Winston, that no one whom we bring to this place ever leaves our hands uncured? We are not interested in those stupid crimes that you have committed. The Party is not interested in the overt act; the thought is all we care about. We do not merely destroy our enemies, we change them....' George Orwell, *Nineteen Eighty-Four* 265 (Alfred A. Knopf, Inc. 1992).

■ Even assuming, *arguendo*, that a convicted person receives some benefit from his experience with the guiding hand of the law, clearly the principal purpose of the penal system is to benefit society, not those who break the law. Inasmuch as the public at large is the primary beneficiary, and the convicted persons themselves are, if anything, only incidental beneficiaries of their own prosecutions, the ordinance fails the first prong of the modified *Emerson College* test.

We therefore hold that the ordinance is a tax and not a fee. Because the state has not empowered the city to impose such a tax, the ordinance was invalid. We thus hold that the circuit court was correct in granting Medeiros's motion for an injunction, although its reasoning was somewhat different. *See State v. Christian*, 88 Hawai'i 407, 417 n. 7, 967 P.2d 239, 249 n. 7 (1998) (holding that this court may affirm the circuit court where it reaches the correct result even though the reasoning is different) (citing *Lee v. Heftel*, 81 Hawai'i 1, 2 n. 2, 911 P.2d 721, 722 n. 2 (1996); *State v. Propios*, 76 Hawai'i 474, 486, 879 P.2d 1057, 1069 (1994); *State v. Pinero*, 75 Haw. 282, 290, 859 P.2d 1369, 1373 (1993)).

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's order.