**FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000508
24-AUG-2020
08:00 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
BRIAN D. ADCOCK, Defendant-Appellant

NO. CAAP-19-0000508

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CASE NO. 2CPC-18-0000796)

August 24, 2020

LEONARD, PRESIDING JUDGE, CHAN and HIRAOKA, JJ.

OPINION OF THE COURT BY CHAN, J.

Defendant-Appellant Brian D. Adcock (Adcock) appeals from the May 31, 2019 Judgment; Conviction and Sentence; Notice of Entry (Judgment) entered by the Circuit Court of the Second Circuit (Circuit Court).[1] We hold that the Circuit Court did not err in determining that Adcock validly waived his right to testify and that any error by the Circuit Court in failing to obtain a verbal confirmation of Adcock's understanding of his right not to testify was harmless. We further hold that the

---

[1] The Honorable Rhonda I.L. Loo presided.

Crime Victim Compensation (CVC) fee and Internet Crimes Against Children (ICAC) fee do not amount to unconstitutional taxes and the Circuit Court did not abuse its discretion in imposing the fees against Adcock. However, we conclude that the Circuit Court erred in failing to instruct the jury on merger. For that reason, we vacate the Judgment and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

On October 15, 2018, Adcock was charged with two counts of Terroristic Threatening in the First Degree, in violation of Hawaii Revised Statutes (HRS) § 707-716(1)(e) (2014).[2] In both counts, it was alleged that on October 10, 2018, Adcock threatened Bert Kamaka (Kamaka) and/or Billy Tagay (Tagay) with a knife. Count 1 further alleged that Adcock acted with the intent to terrorize, or in reckless disregard of the risk of terrorizing Kamaka. Count 2 alleged that Adcock acted with the intent to terrorize, or in reckless disregard of the risk of terrorizing Tagay.

During the jury trial, Kamaka testified that on the morning of October 10, 2018, he arrived at Kalama Park with his janitorial crew, which included Tagay, to clean the restrooms. Kamaka and Tagay testified that they noticed Adcock pacing back and forth about twenty feet from their location, making stabbing-type motions with a kitchen knife. Kamaka testified that Adcock then approached them and said "I'm going to stab you mother fuckers," while continuing to make the stabbing-type motions with the knife.

On February 7, 2019, after the State rested its case,

---

[2]    HRS § 707-716(1)(e) provides: "A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening . . . [w]ith the use of a dangerous instrument or a simulated firearm." Terroristic threatening in the first degree is a class C felony.

HRS § 707-715 (2014) provides: "A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person . . . [w]ith the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]"

the Circuit Court initiated the following <u>Tachibana</u>[3] colloquy with Adcock:

> THE COURT: Okay.
>
> So as I discussed with you at the beginning of the trial, Mr. Adcock, you have a constitutional right to testify in your own defense. Although you should consult with your lawyers regarding the decision to testify, it is your decision, and no one can prevent you from testifying should you choose to do so.
>
> If you decide to testify, the prosecution will be allowed to cross-examine you. That means ask questions of you. You also have a constitutional right not to testify and to remain silent. If you choose not to testify, the jury will be instructed that it cannot hold your silence against you in deciding your case.
>
> It is the understanding of the Court that you intend to testify tomorrow. Is that correct?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Okay. Is anyone forcing you or making you do this?
>
> THE DEFENDANT: No.
>
> THE COURT: Anyone putting any pressure on you?
>
> THE DEFENDANT: No.
>
> THE COURT: Are you doing this voluntarily of your own free will?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And have you spoken to your attorneys and discussed this matter with them regarding your decision to testify?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Okay. Regardless of their advice and having discussed the matter with them, is it still your decision to testify in this case?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Okay. And you've had a chance to consult with your lawyers about this decision. Is that right?
>
> THE DEFENDANT: I did.

---

[3]     <u>Tachibana v. State</u>, 79 Hawaiʻi 226, 900 P.2d 1293 (1995).

> THE COURT: Okay. So the Court finds the defendant intends to testify tomorrow.

The next morning, on February 8, 2019, Adcock's counsel informed the Circuit Court that Adcock would no longer be testifying and wanted the Circuit Court to re-Tachibana him. The Circuit Court engaged Adcock in the following colloquy:

> THE COURT: So, Mr. Adcock, as I discussed with you yesterday and at the beginning of the trial, you have a constitutional right to testify in your own defense. Although you should consult with your lawyers regarding the decision to testify, it is your decision and no one can prevent you from testifying should you choose to do so.
>
> If you decide to testify, the prosecutor will be allowed to cross-examine you, in other words, ask you questions. Do you understand?
>
> THE DEFENDANT: I do.
>
> THE COURT: Okay. You also have a constitutional right not to testify and to remain silent. If you choose not to testify, the jury will be instructed that it cannot hold your silence against you in deciding the case.
>
> It is the understanding of myself, the Court, that you do not intend to testify. Is that correct?
>
> THE DEFENDANT: That is correct.
>
> THE COURT: Okay. Is anyone forcing you or making you do this?
>
> THE DEFENDANT: No.
>
> THE COURT: Is anyone putting any pressure on you?
>
> THE DEFENDANT: No.
>
> THE COURT: Anyone -- are you doing this voluntarily, of your own free will?
>
> THE DEFENDANT: Yes.
>
> THE COURT: I know you have two attorneys and you probably discussed this matter in some detail yesterday and probably again today. Is that right?
>
> THE DEFENDANT: That's right.
>
> THE COURT: And you slept on it. Is that a good way to put it? Okay. I just want to make sure, regardless of your attorneys' advice, it is your decision and your decision alone not to testify. Is that correct?
>
> THE DEFENDANT: That's correct.

THE COURT: Okay.  The Court, after questioning the defendant, finds that he has voluntarily, intelligently, and knowingly decided not to testify in front of the jury.

The defense then rested without calling any witnesses or presenting any evidence.

During the settling of jury instructions, Adcock's counsel argued: "[W]e are dealing with two counts of the identical offense, and the record shows, in our view, a scintilla of evidence that this was a continuous course of conduct on October 10th, done with one intention or impulse.  We believe that a merger instruction[4] must be given."  The Circuit Court refused to provide the instruction.  The jury ultimately found Adcock guilty as charged for both counts of Terroristic Threatening in the First Degree.

The Circuit Court entered its Judgment on May 31, 2019,[5] sentencing Adcock on each count to five years in prison,

---

[4]     Adcock proposed the following instruction:

> If and only if you find the Defendant guilty of any of the offenses in Count 1 and Count 2, you must then determine if the counts merge into a single offense and answer the following questions on a special interrogatory that will be provided to you:
>
> > (1)     Did the prosecution prove beyond a reasonable doubt that the Defendant did not commit the offenses in Count 1 and Count 2 as part of a continuing and uninterrupted course of conduct?
> >
> > (2)     Did the prosecution prove beyond a reasonable doubt that the Defendant committed the offenses in Count 1 and Count 2 with separate and distinct intents, rather than acting with one intention, one general impulse, and one plan to commit these offenses?
>
> Your answers to these questions must be unanimous.  If you answer both questions in the negative, the offenses merge.  If any answer is answered in the affirmative, the offenses are separate and distinct.

[5]     The Judgment appears to mistakenly indicate that Adcock pled guilty to the two counts of Terroristic Threatening in the First Degree.  However, the jury verdict and Adcock's Opening Brief state that he pled not guilty and proceeded to jury trial, where the jury ultimately found him guilty on both counts of terroristic threatening.

to be served concurrently, with credit for time served, and ordered him to pay a $105 CVC fee and a $100 ICAC fee, for a total of $410.  On the same day, Adcock moved to strike the imposition of the fees as being unconstitutional taxes.  The Circuit Court denied Adcock's motion to strike the imposition of the fees on June 26, 2019.

## II.  POINTS OF ERROR

On appeal, Adcock raises three points of error, contending that the Circuit Court erred by: (1) failing to conduct a "true colloquy" with him about his constitutional right to testify; (2) not providing the jury with a merger instruction under HRS § 701-109(1)(e) (2014); and (3) levying the $410.00 in fees, which he asserts "[wa]s an [u]nconstitutional [d]elegation of the [l]egislature's [t]axation [p]ower[.]"

## III.  STANDARDS OF REVIEW

A.    Waiver of Right to Testify

We review whether a criminal defendant knowingly, intelligently, and voluntarily waived his or her right to testify under the right/wrong standard.  State v. Eduwensuyi, 141 Hawaiʻi 328, 332-33, 409 P.3d 732, 736-37 (2018).

B.    Jury Instructions

In reviewing a trial court's refusal to give a jury instruction, we examine

> whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.  Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.  In other words, error is not to be viewed in isolation and considered purely in the abstract.

State v. Matuu, 144 Hawaiʻi 510, 516, 445 P.3d 91, 97 (2019) (quoting State v. Kassebeer, 118 Hawaiʻi 493, 504, 193 P.3d 409, 420 (2008)).

C.    Constitutionality of Statutes

> [T]he constitutionality of a statute is a question of law which is reviewable under the right/wrong standard. Additionally, where it is alleged that the legislature has

6

> acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest, and unmistakable.

State v. Calaycay, 145 Hawaiʻi 186, 197, 449 P.3d 1184, 1195 (2019) (quoting State v. Gaylord, 78 Hawaiʻi 127, 137, 890 P.2d 1167, 1177 (1995)).

## IV. DISCUSSION

A. Waiver of Right to Testify

Adcock first alleges that the Circuit Court failed to engage in a "true colloquy" with him prior to the waiving of his right to testify at trial.

Under Tachibana v. State, "trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify." 79 Hawaiʻi at 236, 900 P.2d at 1303. This colloquy is also required where the defendant does testify, "effectively making such a colloquy necessary in every trial." State v. Torres, 144 Hawaiʻi 282, 285, 439 P.3d 234, 237 (2019).

A Tachibana colloquy has two components: an appraisal of the "fundamental principles pertaining to the right to testify and the right not to testify[,]" State v. Celestine, 142 Hawaiʻi 165, 170, 415 P.3d 907, 912 (2018) (citing Tachibana, 79 Hawaiʻi at 236 n.7, 900 P.2d at 1303 n.7), and "a verbal exchange between the judge and the defendant 'in which the judge ascertains the defendant's understanding of the proceedings and of the defendant's rights[,]'" id. (emphasis omitted) (quoting State v. Han, 130 Hawaiʻi 83, 90, 306 P.3d 128, 135 (2013)). Thus, a valid waiver of the right to testify necessarily follows an accurate advisement of rights and the defendant's acknowledgment of those rights. Eduwensuyi, 141 Hawaiʻi at 336, 409 P.3d at 740.

In order to be a "true colloquy," the trial court

7

cannot merely "recite[] a litany of rights" but must ascertain whether the defendant understood his or her rights and the protections associated with those rights, through a verbal exchange.  State v. Pomroy, 132 Hawaiʻi 85, 93-94, 319 P.3d 1093, 1101-02 (2014).

The Circuit Court in this case properly advised Adcock of his rights both to testify and not to testify on two occasions.  See Tachibana, 79 Hawaiʻi at 236 n.7, 900 P.2d at 1303 n.7 (instructing that the colloquy should advise the defendant "that he or she has a right to testify, that if he or she wants to testify that no one can prevent him or her from doing so, and that if he or she testifies the prosecution will be allowed to cross-examine him or her.  In connection with the privilege against self-incrimination, the defendant should also be advised that he or she has a right not to testify and that if he or she does not testify then the jury can be instructed about that right." (citation and brackets omitted)); Pomroy, 132 Hawaiʻi at 91, 319 P.3d at 1099 (noting that footnote seven in Tachibana "stated the purpose and substance of the right-to-testify colloquy").  The record, however, lacks a verbal exchange after the Circuit Court apprised Adcock of his right not to testify on either of the two occasions, the first point at which Celestine advises the trial court to conduct such an exchange.  142 Hawaiʻi at 170, 415 P.3d at 912.

Adcock argues that without a "true colloquy" there could not be a valid waiver of the right not to testify.  In Pomroy, the supreme court held, *inter alia*, that the lower court erred when it did not properly inform the defendant of his right to testify and the defendant subsequently decided not to testify. 132 Hawaiʻi at 92-94, 319 P.3d at 1100-02.  Unlike here, the error in Pomroy was related to the right that Pomroy waived and therefore was not harmless.  See id.  In this case, Adcock decided not to testify, thereby waiving his right to testify, but asserts that the Circuit Court's failure to engage in a "true

colloquy" about his right not to testify warrants a new trial. We have previously held that when the deficiency in a Tachibana colloquy is not related to the right waived, the error appears harmless. See State v. Pantke, No. CAAP-17-0000440, 2018 WL 1918200, at *2 n.4 (Haw. App. Apr. 24, 2018) (SDO) ("Because th[e] error here . . . was in failing to properly advise Pantke of his right not to testify, and Pantke did not testify, the error appears to be harmless."); State v. Dykas, No. CAAP-17-0000352, 2018 WL 852202, at *2 (Haw. App. Feb. 14, 2018) (SDO) (determining that where the court omitted the advisement that no adverse inference could be made from the defendant not testifying and the defendant exercised her right not to testify, the omission had no effect on the defendant's decision not to testify because knowing that there would be no adverse consequences from her failure to testify would not have caused or influenced her to testify). Therefore, even if we were to conclude that the Circuit Court erred in not obtaining verbal confirmation that Adcock understood his right not to testify, such error is harmless because Adcock did not waive that right.

The crux of the issue is thus whether Adcock properly waived his right to testify. To determine whether Adcock validly waived his right to testify we must look at the totality of the facts and circumstances in this case. See Celestine, 142 Hawaiʻi at 171, 415 P.3d at 913. After examining the totality of the facts and circumstances of the case before us, we conclude that Adcock knowingly, intelligently, and voluntarily waived his right to testify. Decisive to our inquiry is the fact that Adcock concedes that on February 8, 2019, the Circuit Court "correctly inquired" whether he understood his right to testify, shortly before he waived that right. On the previous day, his counsel announced he would testify, but Adcock retracted that decision and relayed that he "would like [the Circuit Court] to re-Tachibana him." During the second colloquy, Adcock affirmed to the Circuit Court that he understood he had the right to

testify.  His own affirmation that he understood the right to testify provides an objective basis for us to conclude that his waiver of the right to testify was knowing, intelligent, and voluntary.  See id. at 170, 415 P.3d at 912.  Thus, the record shows that Adcock was properly advised of his right to testify, affirmed that he understood that he had the right to testify, and waived his right to testify.

B.    Merger

In his second point of error, Adcock alleges that the Circuit Court erred by refusing to instruct the jury on the law of merger.

The law of merger, under HRS § 701-109, "interposes a constraint on multiple convictions arising from the same criminal conduct" and "reflects a policy to limit the possibility of multiple convictions and extended sentences when the defendant has basically engaged in only one course of criminal conduct directed at one criminal goal, or when it would otherwise be unjust to convict the defendant for more than one offense." State v. Deguair, 139 Hawaiʻi 117, 128, 384 P.3d 893, 904 (2016) (internal quotation marks omitted) (first quoting State v. Matias, 102 Hawaiʻi 300, 305, 75 P.3d 1191, 1196 (2003) and then quoting Commentary to HRS § 701-109); State v. Frisbee, 114 Hawaiʻi 76, 80-81, 156 P.3d 1182, 1186-87 (2007) (stating the same).  HRS § 701-109(1)(e) provides, in relevant part, that "[t]he defendant may not . . . be convicted of more than one offense if . . . [t]he offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses."

In order for the court to be able to instruct the jury on the merger, all three elements of subsection (e) must apply: (1) the offense must be defined as a continuing course of conduct; (2) the defendant's conduct was uninterrupted; and (3) the law does not specify that periods within that course of

conduct are separate offenses.  See HRS § 701-109(1)(e); State v. Lavoie, 145 Hawaiʻi 409, 431, 453 P.3d 229, 251 (2019).

Central to the issue here is whether terroristic threatening with a dangerous weapon or simulated firearm is defined as continuing course of conduct.  Whether a particular criminal offense can be charged as a continuous offense is a question of law.  Lavoie, 145 Hawaiʻi at 431, 453 P.3d at 251 (citing State v. Decoite, 132 Hawaiʻi 436, 442, 323 P.3d 80, 86 (2014) (Pollack, J., dissenting)).  "The test for whether a crime can be charged as a continuous offense is whether the statute precludes charging an offense as a continuous offense, and whether the element(s) of the offense may constitute a continuous, unlawful act or series of acts, however long a time the act or acts may occur."  Id. (citing Decoite, 132 Hawaiʻi at 438, 323 P.3d at 82 (majority opinion)).

The State argues that HRS § 707-716(1)(a) (2014), threatening one victim on multiple occasions with a single intent, and subsection (b), threatening multiple victims on one occasion, are continuing courses of conduct, and by implication, the other subsections, including subsection (e) do not address continuing courses of conduct.  Without a doubt, the statutory definition of terroristic threatening under subsection (a) permits a showing that the offense "was committed by a series of acts constituting a continuing course of conduct."  State v. Apao, 95 Hawaiʻi 440, 447-48, 24 P.3d 32, 39-40 (2001) (denying specific unanimity instruction in terroristic threatening charge where the record indicated that multiple threats occurred over one uninterrupted occasion).  The supreme court did not address the remaining subsections but noted that "the very nature of threatening conduct connotes a combination or series of words and/or actions that together constitute a threat."  Id. at 447, 24 P.3d at 39.

Nothing in the language of HRS § 707-716(1)(e) "precludes" charging terroristic threatening with a dangerous

11

instrument under subsection (e) as a continuous offense.  See Lavoie, 145 Hawaiʻi at 431, 453 P.3d at 251; State v. Arceo, 84 Hawaiʻi 1, 18–19, 928 P.2d 843, 860–61 (1996) (stating that examples of "continuing offenses" include: first degree murder; first degree robbery; kidnapping, under certain circumstances; theft of a firearm; and theft of state property by deception; but do not include "sexual offenses").

Because terroristic threatening may be defined as a continuing course of conduct, HRS § 701-109(1) may apply.  "If there is a possibility that two counts of a complaint are 'grounded in the same conduct,' HRS § 701-109(1) mandates, 'at a minimum, that the circuit court instruct the jury regarding merger.'"  State v. Wilson, No. 28478, 2009 WL 48141, at *18 (Haw. App. Jan. 7, 2009) (mem. op.) (quoting Frisbee, 114 Hawaiʻi at 80, 156 P.3d at 1186).

> Whether a course of conduct gives rise to more than one crime within the meaning of HRS § 701-109(1)(e) depends in part on the intent and objective of the defendant.  The test to determine whether the defendant intended to commit more than one offense is whether the evidence discloses one general intent or discloses separate and distinct intents.  Where there is one intention, one general impulse, and one plan, there is but one offense.  All factual issues involved in this determination must be decided by the trier of fact.

State v. Hoey, 77 Hawaiʻi 17, 27 n.9 , 881 P.2d 504, 514 n.9 (1994) (emphasis added) (brackets omitted) (quoting State v. Alston, 75 Haw. 517, 527–28, 531, 865 P.2d 157, 163–65 (1994)).  Indeed, "the state of mind of the defendant at the time . . . will determine the number of charged crimes of which the defendant may properly be convicted, and merger is the means by which charging schemes that do not comport with the defendant's state of mind are corrected."  State v. Ganal, 81 Hawaiʻi 358, 384, 917 P.2d 370, 396 (1996) (applying HRS § 701-109(1)(a) to convictions for first-degree murder and attempted first-degree murder involving multiple victims).

The number of victims does not preclude the use of merger, where facts presented show only a general intent to

commit the offense.  See, e.g., State v. Galante, No. CAAP-15-0000376, 2019 WL 926627, at *2 (Haw. App. Feb. 26, 2019) (SDO) (determining that two counts of Inattention to Driving merged where the defendant's conduct resulted in a single collision between the defendant's vehicle and a vehicle containing two people).  In Deguair, 139 Hawai‘i at 128-129, 384 P.3d at 904-05, the supreme court concluded that four kidnapping convictions, each involving a different victim, should merge with a robbery conviction because the jury had found that "each kidnapping was committed as a continuing course of conduct, with no separate and distinct intent from the robbery."  Thus, the supreme court emphasized that intent, and not the result of the conduct upon each victim, is paramount when applying merger.

Here, the indictment cites the same conduct in both counts: "that [Adcock] . . . did threaten, by word or conduct, to cause bodily injury to Bert Kamaka and/or Billy Tagay, with the use of a dangerous instrument or a simulated firearm, to wit, a knife[.]"  The counts differ in the intent element, alleging that Adcock intended to terrorize or recklessly disregarded the risk of terrorizing, Kamaka in Count 1, and Tagay in Count 2.

Adcock maintains on appeal that "[b]oth complainants testified that Mr. Adcock's words and conduct constituted the same act and that he threatened both complainants at the same time."  Kamaka testified that prior to starting work in the Kalama Park area on October 10, 2018, he warned his janitorial crew that a man had approached him at the park the day before and told Kamaka that he would cut and stab Kamaka if the crew touched the man's and another homeless man's belongings.  When the janitorial crew arrived at the park in the early morning of October 10, 2018, Adcock was pacing along a walkway leading to the bathroom with a kitchen knife.  Kamaka testified that Adcock approached the truck and crew with the kitchen knife while making stabbing motions, and yelled, "I'm going to stab you mother fuckers."  Tagay also testified that Adcock said he was going to

13

stab them, while showing them the knife, and took steps towards where the crew was.  Tagay further stated that Adcock smirked at the crew and taunted them, "calling us losers and stuff." Adcock's statement to police after his arrest, however, was that he only addressed one of the members of the janitorial crew, asking him, "[Y]ou don't sound retarded, why are you stealing their jobs?"  Whether Adcock possessed a "separate and distinct intent" to terrorize Kamaka and Tagay individually was a factual issue to be determined by the trier of fact.  See Hoey, 77 Hawaiʻi at 27 n.9, 881 P.2d at 514 n.9.  The jury instructions were prejudicially insufficient, and thus the Circuit Court erred in refusing to instruct the jury regarding the merger of the two counts.

Adcock maintains that a finding of instructional error requires that his sentence be vacated and remanded for a new trial.

> When a trial court plainly errs by failing to give a merger instruction in the first place, the usual remedy is a retrial.  However, as noted approvingly by the Supreme Court of Hawaiʻi in Deguair, when, on appeal, the State suggests dismissing one of the defendant's convictions to remedy the defect rather than face wholesale retrial, the appellate court may remand for that purpose.

State v. Hufanga, No. CAAP-17-0000737, 2019 WL 1487047, at *3 (Haw. App. April 4, 2019) (SDO) (citations omitted). Accordingly, we vacate the judgment and remand, giving the State the option of retrying Adcock's charged offenses with the appropriate merger instruction or dismissing one of the terroristic threatening charges.  See State v. Padilla, 114 Hawaiʻi 507, 517, 164 P.3d 765, 775 (App. 2007).

C.    Post-Trial Fee Discussion

Adcock claims that the Circuit Court's assessment of $410 was the result of an unconstitutional delegation of the legislature's taxation power to the judiciary.  Under the Hawaiʻi Constitution, the State has reserved the power of taxation to the legislature, but such power may be delegated by the legislature to the counties.  Hawaii Insurers Council v. Lingle, 120 Hawaiʻi

51, 70, 201 P.3d 564, 583 (2008) (citing Haw. Const. art. VIII, § 3); see also McCandless v. Campbell, 20 Haw. 411, 420 (Haw. Terr. 1911) ("The power of taxation is essentially a legislative power. It cannot be delegated except to municipalities which themselves exercise subordinate legislative powers.").

The fees here were created by the legislature, specifically under HRS § 351-62.6 (2015) and HRS § 846F-3 (2015). These statutes have a presumption of constitutionality and it is Adcock's burden to show unconstitutionality beyond a reasonable doubt. Calaycay, 145 Hawaiʻi at 197, 449 P.3d at 1195.

Because these fees were established by the legislature, they are distinguishable from the fees challenged in the cases Adcock relies upon. Particularly, State v. Medeiros, 89 Hawaiʻi 361, 973 P.2d 736 (1999), concerned fees established by a Honolulu municipal ordinance, and Hawaii Insurers Council, 120 Hawaiʻi 51, 201 P.3d 564, concerned fees established by the Insurance Commission, a regulatory agency.

Adcock bases his argument that the legislature impermissibly delegated its taxation power to the judiciary on the assertion that the "fees" assessed as part of his sentence were not "fees," but rather "taxes." Adcock posits that "[a]ny charge 'imposed by the government on persons, entities, transactions, or property to yield public revenue' is a tax." This is a faulty syllogism based on the Black's Law Dictionary definition quoted in Hawaii Insurers Council which defines tax as "[a] monetary charge imposed by the government on persons, entities, transactions, or property to yield public revenue." 120 Hawaiʻi at 60, 201 P.3d at 573 (quoting Black's Law Dictionary 1496 (8th ed. 2004)). Adcock ignores that the court emphasized that "[n]ot every exaction by state authorities is a tax." Id. at 59, 201 P.3d at 572 (brackets in original) (quoting Hexom v. Oregon Dep't of Transp., 177 F.3d 1134, 1135 (9th Cir. 1999)).

The nature of a charge imposed by law "is not

15

determined by the label given to it but by its operating incidence."  Medeiros, 89 Hawaiʻi at 366, 973 P.2d at 741 (quoting Stewarts' Pharmacies v. Fase, 43 Haw. 131, 144 (1959)); see also People v. Graves, 919 N.E.2d 906, 910 (Ill. 2009) ("[T]he statutory labels applied to a charge do not control where the purpose of the charge contradicts that label." (citing People v. Jones, 861 N.E.2d 967, 985-86 (Ill. 2006))).  Therefore, it is inconsequential that the charges that Adcock challenges are labeled as "fees."

The Hawaiʻi Supreme Court has defined "taxes" as follows:

> Taxes are the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government, and for all public needs.
>
> Taxes are generally defined as burdens or charges imposed by legislative authority on persons or property to raise money for public purposes, or, more briefly, an imposition for the supply of the public treasury.
>
> The word taxes is very comprehensive, and properly includes, as indicated in the foregoing definition, all burdens, charges and impositions by virtue of the taxing power with the object of raising money for public purposes.

Hawaii Insurers Council, 120 Hawaiʻi at 59-60, 201 P.3d at 572-73 (quoting McCandless, 20 Haw. at 420).

A fee is a charge that "(1) applies to the direct beneficiary of a particular service, (2) is allocated directly to defraying the costs of providing the service, and (3) is reasonably proportionate to the benefit received."  Medeiros, 89 Hawaiʻi at 367, 973 P.2d at 742 (modifying the test enunciated in Emerson College v. City of Boston, 462 N.E.2d 1098, 1105 (Mass. 1984)).  The supreme court has further distinguished between user fees and regulatory fees.  A user fee, such as a bridge toll or charges for sewer hookups or wastewater management, is "based on the rights of the entity as a proprietor of the instrumentalities used."  Hawaii Insurers Council, 120 Hawaiʻi at 60, 201 P.3d at 573 (quoting Medeiros, 89 Hawaiʻi at 366, 973 P.2d at 741).  A user fee is generally charged to the recipient of a service

provided by the government.  Id. at 62, 201 P.3d at 575.  In contrast, regulatory fees, such as licensing and inspection fees, are "founded on the police power to regulate particular businesses or activities."  Id. (quoting Medeiros, 89 Hawaiʻi at 366, 973 P.2d at 741).

The Attorney General, in an amicus brief, posits a third possibility: that the assessed charges are "fines."  A "'fine' is 'a pecuniary punishment or penalty[.]'"  Casumpang v. ILWU Local 142, 108 Hawaiʻi 411, 422, 121 P.3d 391, 402 (2005) (quoting Black's Law Dictionary 6th ed. 1990)).  More specifically, it is a "a retributive payment due the sovereign." State v. Toyomura, 80 Hawaiʻi 8, 18 n.14, 904 P.2d 893, 903 n.14 (1995) (emphasis in original) (internal quotation marks omitted) (quoting Gaylord, 78 Hawaiʻi at 152, 890 P.2d at 1192).  Fines are included in the punishments prescribed by the legislature in HRS § 706-605 (2014 & Supp. 2018).  See also State v. Nunes, 72 Haw. 521, 524, 824 P.2d 837, 839 (1992).  Under the Hawaii Penal Code, fines are permitted in addition to a sentence of imprisonment or incarceration where "[t]he court is of the opinion that a fine is specially adapted to the deterrence of the crime involved or to the correction of the defendant."  HRS § 706-641(2)(b) (2014).

The Illinois Supreme Court has held that "the central characteristic which separates a fee from a fine" is "whether the charge seeks to compensate the state for any costs incurred as the result of prosecuting the defendant."  Graves, 919 N.E.2d at 910 (citing Jones, 861 N.E.2d at 986).  "A charge is a fee if and only if it is intended to reimburse the state for some cost incurred in defendant's prosecution."  Id.  A fine, on the other hand, is imposed only after conviction for a criminal offense and is payable to the State treasury, and may, but is not required to, vary with the severity of the behavior.  See Jones, 861 N.E.2d at 975, 986.

Of the three classifications, the ICAC fee and CVC fee

17

most resemble fines.  Both are penalties imposed after criminal convictions, both are to be paid into special funds in the State treasury that do not reimburse payments related to the defendant's prosecution, and in the case of the CVC special fund, the severity of the crime is a criterion to be considered when the court orders the payment.

The fees in question are punitive in nature.  HRS § 706-605(6) mandates that the court "shall impose a compensation fee upon every person convicted of a criminal offense pursuant to section 351-62.6," which in turn provides that the fee must be imposed on every defendant convicted and "who is or will be able to pay the compensation fee."  Similarly, HRS § 846F-3 requires the court to order "every defendant to pay an internet crimes against children fee of up to $100 for each felony or misdemeanor conviction; provided that no fee shall be ordered when the court determines that the defendant is unable to pay the fee." Therefore, the legislature authorized the imposition of the charges at issue here as a punishment for criminal behavior.

The charges were not created to offset the costs of prosecution.  The CVC special fund, which is supported in part by fees authorized under HRS § 351-62.6, is intended "to aid victims of criminal acts, by providing compensation for victims of certain crimes or dependents of deceased victims[.]"  HRS § 351-1 (2015).  ICAC fees are to be deposited in a special fund that shall be expended by the Attorney General to train, equip, and enable local law enforcement agencies in investigating and prosecuting internet crimes against children, and to assist groups working directly to combat internet crimes against children.  HRS § 846F-4(b) (2015).  Although Adcock is correct in stating that money from the charges do not "defray any costs for services to the defendants," which weighs against considering the charges to be "fees" as described in Medeiros and Hawaii Insurers Council, that point does not preclude them from being fines.

Further supporting the conclusion that the CVC fee is a

fine, the statute authorizing it requires the court to consider HRS § 706-641, which applies to other criminal fines, when determining the amount a defendant must pay.  See HRS § 351-62.6(b).  The statute also directs that

> the court shall consider all relevant factors, including but not limited to:
>
> (1)   The seriousness of the offense;
>
> (2)   The circumstances of the commission of the offense;
>
> (3)   The economic gain, if any, realized by the defendant;
>
> (4)   The number of victims; and
>
> (5)   The defendant's earning capacity, including future earning capacity.
>
> (c)   The compensation fee shall be considered a civil judgment.

HRS § 351-62.6(b), (c).  Thus, the rates vary, in part, with the seriousness of the offense, a factor demonstrating that a charge is a fine under Jones.

Adcock complains that these fees turn the courts into revenue centers for the State.  On this point, comparison to Medeiros is instructive.  The ordinance held to be unconstitutional in Medeiros gave the city discretion to use the funds in accordance with the city's annual operating budget, rather than mandated that they be used on the law enforcement objectives for which the "service fee" was purportedly established.  89 Hawaiʻi at 367 & n.5, 973 P.2d at 742 & n.5.  Thus, the supreme court found, there was a "possibility that the charge could be used for general revenue raising purposes, the classic realm of taxation."  Id. at 367, 973 P.2d at 742.  In contrast, the CVC fee and ICAC fee are deposited into special funds, which are required by statute to be expended for limited purposes; their use is not discretionary.  "Moneys received [in the CVC special fund] shall be used for compensation payments, operating expenses, salaries of positions as authorized by the

legislature, and collection of fees." HRS § 351-62.5(d) (emphasis added). Likewise, HRS § 846F-4(b) mandates that funds in the ICAC special fund be used

> (1) To provide training and equipment for local law enforcement agencies to use in investigating and prosecuting internet crimes against children, including funding to increase the forensic capacity of digital evidence;
>
> (2) To enable law enforcement to investigate and prosecute internet crimes against children; and
>
> (3) To assist groups working directly to combat internet crimes against children.

Because the use of the funds is controlled by a mandatory rather than discretionary statute, the fees cannot be classified as taxes. See Medeiros, 89 Hawai'i at 367 & n.5, 973 P.2d at 742 & n.5.

Finally, Adcock complains that "[n]one of his offenses are in any way related to internet crimes against children." To the extent that we read this complaint as an argument that the statute violates his right to substantive due process because there is no rational basis for the imposition of the ICAC fee, we disagree. As we previously recited, it is well established that "every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest, and unmistakable." Calaycay, 145 Hawai'i at 197, 449 P.3d at 1195 (quoting Gaylord, 78 Hawai'i at 137, 890 P.2d at 1177). "Under rational basis review, a statute must 'rationally further a legitimate state interest.' A state interest is 'legitimate' if it involves the public health, safety, or welfare." State v. Mallan, 86 Hawai'i 440, 451-52, 950 P.2d 178, 189-90 (1998) (quoting Estate of Coates v. Pac. Engineering, 71 Haw. 358, 363-64, 791 P.2d 1257, 1260 (1990)). The legislature determined that assessing this charge serves the public safety and welfare because it serves a punitive purpose against those who are

convicted, and it furthers the legitimate state interest of pursuing those who commit internet crimes against children by providing funding for the program as described in HRS chapter 846F. The Circuit Court recognized this, and, citing State v. Peraza, 467 S.W.3d 508 (Tex. 2015), concluded that the funds were expended for "legitimate criminal justice purposes." There is sufficient justification for the fees to survive rational basis scrutiny.

Adcock has not met his burden of showing that the statutes under which he was ordered to pay fees as part of his sentence are unconstitutional. "[W]hile a sentence may be authorized by a constitutionally valid statute, its imposition may be reviewed for plain and manifest abuse of discretion." State v. Martin, 103 Hawaiʻi 68, 74, 79 P.3d 686, 692 (App. 2003) (quoting Gaylord, 78 Hawaiʻi at 144, 890 P.2d at 1184). "Generally, to constitute an abuse[,] it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Id.

Adcock complains that the sentencing court has "unfettered discretion in fixing" the fees. To the contrary, HRS § 706-605(6) requires the imposition of the CVC fee on every person convicted of a criminal offense, but HRS § 351-62.6 provides that the court shall waive the fee if the court finds that the defendant is unable to pay. Similarly, the ICAC fee is contingent on the defendant's ability to pay. Adcock's counsel twice admitted that the objection was not based on Adcock being unable to pay. Accordingly, the Circuit Court did not abuse its discretion in imposing the mandatory fines against Adcock.

## V.   CONCLUSION

Based on the error in instructing the jury on merger, we vacate the May 31, 2019 Judgment; Conviction and Sentence; Notice of Entry and remand this matter to the Circuit Court for resentencing, or in the alternative, a new trial.


On the briefs:

Benjamin E. Lowenthal,                    /s/ Katherine G. Leonard
Deputy Public Defender,
for Defendant-Appellant.
                                          /s/ Derrick H. M. Chan
Richard B. Rost,
Deputy Prosecuting Attorney,
County of Maui,                           /s/ Keith K. Hiraoka
for Plaintiff-Appellee.